Good morning, I'm Philip Brooks representing Mr. Hargrove. I'd like to focus on the Batson issue that was raised in this case, unless the court has another idea. It's our position that the findings and recommendations of the magistrate judge in this case were correct, and that there was a carefully reasoned analysis by the magistrate judge. And we would hope that this Court would return to the findings and recommendations of the magistrate judge as a guide in reaching its decision, because we think the judge was correct. I suppose the real issue is were they challenged because they were black or for some individualized reasons? And I don't understand why these aren't individualized reasons, like knowing gang members personally. Well, I think a good template for looking at the issues in this case is the Ninth Circuit case of Green v. Lamarck. It was filed last August that I hope I have cited in my reply brief, which I don't have with me. But in any event, it was decided in August. And the site that I have for it is a Lexis site, which is 2008 U.S. App Lexis 16483. I haven't looked at that. It's a published decision of our court? Yes. What was the 2008 West Law what? Lexis. U.S. App Lexis. Lexis, I'm sorry. 16483. There was a – this was, I think, a modification of this decision at that point. The previous citation to the case was 532 F3 1028. That came out in July, and then in August there was a slight modification to the opinion. That was the first site I gave you. But there as here, the district attorney excused all of the eligible black jurors from the jury pool. Six out of six there, three out of three here. And as to the first of the three, in this case, the district attorney was not asked to state reasons and no individualized reasons were given. And the argument – In this case? In this case. I'm talking about this case here. Do you agree that when you make the – were you the trial counsel? No. Somebody else. Okay. Okay. If he made an objection, then in Stacy's case, then the burden shifts over to the prosecution. And in this case, didn't the prosecution indicate specifically why each of these people were excluded to overcome pretext? I'm sorry. Not as to juror number one. Juror number one, she was a young single mother, appeared to have difficulty understanding the law. That's not what the prosecutor said. That's what the court said. Okay. What did the prosecutor say? The prosecutor said, I evaluated both – the two jurors were concerned in this first Batson motion, J-1 and J-2. The prosecutor said, as to both of these jurors, although the court did not find a prima facie case as to the first of them, the prosecutor began saying, as to both of these, I read the jury questionnaires, and both jurors had a low score on my evaluation of their questionnaires. And the judge then directed the district attorney to focus on the second juror, J-2, reminding the DA that he had not found a prima facie case as to J-1, and he didn't want to hear the prosecutor's opinion. If that's the case, then, counsel, then you don't even get to where the prosecution has to justify the decision if there's no prima facie case established, right, on J-1? That's right. As to J-1, our position is the trial court made a mistake in not finding a prima facie case. And why is that? And that's because there was evidence before the court that justified an inference that the prosecutor had exercised a race-based, discriminatorily race-based – And what was that? That was that the prosecutor had excused all three of the available black jurors. So you're basing it on the small statistical analysis, basically? That's right. That's right. There are numerous cases that we've cited that say that this kind of a statistical disparity is not likely to happen by chance. Well, I thought R. Fernandez v. Roe indicated that two challenges are not always enough to establish a prima facie case. And that was two out of two in that case. Well, in Greenland v. Lamarck, we have six out of six. They said that was enough. Then we have the other cases that I could refer the court to are – Do you have any of our cases that deal with a three-out-of-three situation? Let's see. In terms of statistical analysis. Now, at the time that this was raised, the prosecutor had only stricken two. They had not stricken J-3 yet. That's correct. And so that's – They don't have three-out-of-three at that point when it was raised. That's correct, Your Honor. And the court says you don't have a prima facie case. But that's correct, Your Honor. But it's our position that because this Court exercises de novo review, that what this Court looks at is the entire picture, and that we know that in the end all three were excused. And furthermore, when the second Batson motion was made, all three had been excused, and that at that point, that evidence of all three being excused was before the trial court. So that if not before, at least at that point, the trial court should have asked the prosecutor to state his reasons. It should have been a prima facie case. I was going to say, did the defense counsel renew the motion and say, well, now that we've got three-out-of-three, I renew the motion on Batson under Juror No. 1? He referred to the fact that the prosecutor had now removed all three, and the judge then said, I'm not going to revisit those challenges as to the first two. Okay. So he sort of foreclosed them right there. But the defense counsel didn't say, let's do it, or make a motion. He began his presentation by saying the prosecutor has now excused all three. There are no more blacks left in the pool. All of them have been excused by the prosecution's challenges. Is Mr. Hargrove an African-American? Yes. Let's assume we do look at it de novo, and we look at whether there was evidence of pretext on J-1 on the theory that there was a prima facie case. I don't understand why there wouldn't be, not only because of the questionnaire, which strikes me as something that can be considered but not overwhelming, but he knows gang members. He or she knows gang members and knows the witness. It seems like that's a really good reason to exercise a strike, because the lawyer has to be concerned that the juror might be afraid to return a guilty verdict. Your Honor, if the district attorney had articulated that reason, then we could engage in that kind of analysis. But since the district attorney did not articulate any reason, we should follow the United States Supreme Court's decision in Johnson v. California, where the court says that we should not engage either at trial court level or on appeal in needless speculation about what the prosecutor's reasons were when asking a simple question of the prosecutor could have determined what his reasons were. And for us at this point to go to the questionnaire and say, well, we might speculate this or this or this, or to the oral voir dire, or any other part of the record, is not a good idea. No, we always call it speculation when we don't like it, and we call it something, we call it common sense, I guess, when we like it. Well, Your Honor, I believe that the U.S. Supreme Court has told us in Johnson v. California that we're not to exercise that kind of common sense, if you want to call it that, in this situation, where the prosecutor has not articulated any reasons. The appellate courts are not to look to the record to think what their reasons might have been or to speculate what they think a reasonable prosecutor might have done. That's out of bounds under Johnson v. California. I think we're bound by that. What's your solution? Is your solution to have a new trial or to send back to the trial court like this time? If it were only Juror 1, where the court failed to find a crime-official case, there is law suggesting that the case should be remanded for a hearing at which the prosecutor can state if the prosecutor remembers them at this point. That's out of the question. That's right. It's over ten years ago, I think. But it's our position that in this case it's necessary that a new trial be ordered because we don't only have an error in failing to find a crime-official case, we also have, as to the other two jurors, an error in finding at the step three of Batson that there was no purposeful discrimination. It's our contention that Batson erroneous finding, and if that one's wrong, the cases all agree that the remedy is to order a new trial. Do you agree if we uphold the state on the last two jurors, and the first juror, as you, has to go back and see if the court can make heads or tails of it? That's right. There's law that would support that disposition, yes, Your Honor. I think I'd like to reserve the rest of my time for rebuttal, if I may. Thank you, counsel. Good morning. Carlos Martinez from the California Attorney General's Office, representing the Respondent. I'm at a little bit of a disadvantage as far as the Green v. Lamarcae case. It's not cited in Pellin's reply brief or in the ---- Counsel, can we talk about the issue of the ---- well, I've never prosecuted. I've only defended. But if I'd been prosecuting, I sure would have struck anybody that had gang contacts because I'd be concerned that they'd be scared. Your adversary says we can't consider that because the prosecutor didn't articulate it. That's actually not true, Your Honor. That's what I want to know. Is that correct? No, Your Honor. Are two things correct, that the prosecutor didn't make that argument, and also even if he didn't, that we can't consider it? When the court started this, it wanted to discuss juror two, which is right. That's the one who was currently facing a drunk driving charge? That would be J3, Your Honor. J2 is a person who ---- I'm sorry. Yeah, the husband was being prosecuted. J2 has the husband with the DUI. That's correct. But when the first wheeler motion basking claim was raised, the prosecutor said, when I looked at the questionnaires, Your Honor, I went ahead and scored J1, weeks, and J2, low, based on the questionnaire. So that was his reasoning. He didn't articulate. I'm sorry? He didn't articulate. The court had cut him off and said, let's focus on J2 because I didn't find it to be a patient case as far as J1 is concerned. When we look at J1, we can see what prosecutor wanted to strike her. Nineteen years old, single mother, knows, associates with gang members, knows members of the South Mob gangsters, which are somewhat concerned with this case. They're related to this case because they're associates of the East Coast Crips. And that would show up in the questionnaire? That didn't show up on the questionnaire, but the South Mob gangsters are a part of the facts of the case. Okay. Is that how the judge knew about that? During voir dire, she indicated familiarity with the South Mob gangsters. Okay. So would that be in the record or is that before the record? Yes, Your Honor. It would be in the record of voir dire. Okay. The voir dire. Do you have a cite on that? No, it would be in the second supplemental excerpts of record, Your Honor. Okay. So can we consider her acquaintance with gang members if the prosecutor didn't articulate it, even if it's not his fault that he didn't articulate it? Yes, Your Honor. Cut him off. He did say that he scored her very low. Scored her low on the questionnaires. That's a different thing. Are the gang – I thought – maybe I misunderstood it. I thought scoring her low on the questionnaires was because she didn't answer a bunch of the questions. No, Your Honor. She did have lots of problems. She also didn't answer questions – had problems with the law. We're kind of drifting around here. All right. Did the prosecutor ever say that his beef with her was her acquaintance with gang members? Does the remark on the questionnaires mean that? No, Your Honor. He didn't say that that's why he bumped her. He wanted – Okay. Does the questionnaire answer mean that in context? I believe so. It does. Did she talk about her acquaintance with gang members in the questionnaire? Yes, Your Honor, she did. She indicated that she associated with – she had peers and associates who said they were gang members. And that's an excerpt of record 272. So right there off the bat, she's a 19-year-old who associates with gang members. And I took a look at all 12 of the seated jurors and the four alternates. There isn't a single person that has that situation. There's one person who said that he suspected that there may be some of his coworkers who may have been in a gang, but he wasn't sure. And, by the way, the average age of this jury and the alternates is 39. Ten of them were well over 40, were 4-year-olds. So this particular juror – Let's see, 272.  It's hard to read. Could you read the relevant thing? I can't read it. I can, Your Honor. It's 272. Yeah, I'm on 272, questions 49 through 53. Oh, I think you're talking about 53. I can read the X, but I can't read what she wrote. And we're talking about the excerpts of records, Your Honor, or the second supplemental excerpts of records? Excerpts of records. We're talking about what you just cited to me. Yes, Your Honor. You cited it. I opened to it. I think what you're proving to me and what I was asking about is, did the prosecutor say he was preempting her because of her association with gang members? And you said, yes. See, he said he rated her low because of her answers, and 272 was the answer. I think that's how I understood the argument. So I'm looking at what you cited, 272, to see if it's the answer, and I can't read it. So tell me what it says. I can read the X mark in the yes box. Yes, Your Honor. It says, it's question number 53. Do you know or have you known any member, any people who believe, you believe to be gang members? Answer, yes. Peers and associates names of gangs they were in. Mention names of gangs they were in. So peers and associates mention names of gangs they were in. So that indicates that she does have friends, associates, who are members of her circle. Got it. Who are gang members. So there's a good reason right there to exercise the peremptory challenge of J1. Okay. So we did articulate a gang reason. Yes, Your Honor. Now, J2. J2 is right, and that particular person is a person who is a domestic violence individual. She's a domestic violence victim. Two years earlier, her husband was convicted of domestic violence. He was currently being prosecuted by the San Joaquin County DA's office for a DUI. In fact, he was in the very building. And did the prosecutor say the reason I'm perempting her isn't that she's black, it's that her husband's currently being prosecuted by my office? Yes, Your Honor. He made that very, very clear. Okay. And J3. Because the court asked him if it's a specific reason. Next juror, J3, Smith. She left 16 questions blank on her questionnaire. And then she indicated that she couldn't be fair in a gang case. Now, that right there. She said she couldn't be fair in a gang case? She couldn't be fair in a gang case. And did the prosecutor say that that's why he was thumping her? Yes, Your Honor. He did say that. He said it was he could have been subject, she could have been subject to cops. She asked that on voir dire if he was going under. She was asked that during voir dire and she gave a fairly unintelligible or difficult to understand answer. She indicated that she had family all over Stockton and that she had problems sitting on a gang case. So, there's your three. Even the magistrate judge found that was okay. Yes, Your Honor. Does the court have any other questions about this or any of the other issues? Thank you so much. Thank you, counsel. While we're talking about the juror J1, as to whom no prima facie case was found, I want to observe to the court that in analyzing that juror's situation, the magistrate judge looked to the oral voir dire and the questionnaires of the jurors, did a comparative analysis of not just this juror but the other jurors in the case, to see whether the prosecutor's remark that she had a low score in her questionnaire could be justified. Let me ask you more specifically, not just low score. Were doing a comparative analysis and were there white jurors who were not stricken, who said that they knew people they believed to be gang members? Yes. Yes, that's set forth in the excerpts of record at pages 23 and, no, pardon me, 31 and 32. I was reading the page numbers from the magistrate judge's findings and recommendations. But he summarized this at pages 31 and 32 of the excerpts of record. And, for instance, let's see, seated juror 6 had heard of certain gangs in the community. Juror 10. Heard of. But it's altogether different from knowing. Well. I've heard of the Crips and Bloods myself, but I don't know any of them. They don't know me. Well, let me clarify that when the juror, when Juror J1 said that she knew gang members, what she was talking about was that there were such people that attended her school and she wasn't indicating in any respect that she was dating gang members or that she went to parties with gang members. She said, you know, at school. And when I was in school, there were people in school that we all knew were gang members. That's the one that was stricken. Pardon me? That's the one that was stricken, right? You're talking J1? J1. Right. And the magistrate judge has laid out here. I don't see why that helps you. Pardon me? Because I want to. If I know somebody, and more seriously, he knows me, who's a gangster, and I render a verdict that the gangsters don't like, the fact that I don't go to dances with this person doesn't really matter. What matters is he knows who I am and that I did the wrong thing. But, Your Honor, I don't mean to suggest that. What I mean to suggest is that it matters when we look at the comparative analysis, because that's what the magistrate judge did here. In fact, he looked. Okay, now who else thinks that they may have met gang members or heard of gangs in their community? And he lays this all out. It's different from knowing. Who other than J6? Well, what is knowing? Who other than J1? What white jurors were acquainted with gang members personally? One of the alternate jurors had gang problems in his neighborhood. That's a different issue. Seated juror 2 believes some of the people that he worked with had gang ties. Where's that? That's at excerpts of record page 31. But as Judge Kleinfeld pointed out, though, where you're concerned about someone being fearful of gang retribution and actually knowing somebody, as J1 indicated, that's a very different matter than having heard of someone or maybe knowing somebody at work who maybe knows somebody, isn't it? Your Honor, that is different. And I would emphasize that the prosecutor never said that. Does the prosecutor have to do more than was done here where he identified the problems with the questionnaire and the questionnaire indicates that the person knew gang members? Your Honor, the prosecutor did not identify what problems he was given a chance to, but he did identify the questionnaire, which if you look at the questionnaire that's part of the record, does indicate that she knew gang members. He didn't say that was his problem with the questionnaire. He didn't have a chance to. He didn't ask to. Did the judge cut him off? The judge said, I'd like you to give me more detail about the other one. The judge said, I'm not finding a prima facie case. That removes it. I mean, he doesn't need to state his justifications then. Thank you, counsel. I'm sorry. I didn't mean to end your argument early. Well, let me see if I had anything else intelligent to say. I believe that as to the particulars of each juror, that comparative analysis is too much for us to enter into in a two-minute discussion, but it's laid out in the opinion of the magistrate judge, and we would rely on the comparisons that he set forth there and the ones that we have as far as that goes. And unless the court has other questions, I guess that's all I have to say. Thank you, counsel. Thank you. Hargrove versus Filer is submitted, and we are adjourned. Good morning.
judges: Kleinfeld, Smith M., Siler